UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

DANIEL ESCOBEDO,
        Plaintiff,

vs.                                                            08-2017

MARY MILLER, et al.,
        Defendants.

MEMORANDUM OPINION AND ORDER

      Before the court are Defendant Mary Miller's summary judgment motion [100], Plaintiff's response [103] and Miller's reply [107].

Standard

      Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Any discrepancies in the factual record should be evaluated in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (*citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). The party moving for summary judgment must show the lack of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

      "Summary judgment is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events. *Johnson v. Cambridge Indus.*, Inc., 325 F.3d 892, 901 (7th Cir. 2000). A party opposing summary judgment bears the burden to respond, not simply by resting on its own pleading but by "set[ting] out specific facts showing a genuine issue for trial." *See* Fed. R. Civ. P. 56(e). In order to be a "genuine" issue, there must be more than "some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "If [the nonmovant] does not [meet his burden], summary judgment should, if appropriate, be entered against [the nonmovant]." Fed. R. Civ. P. 56(e). Further, "[t]he plaintiff cannot merely allege the existence of a factual dispute to defeat summary judgment …. Instead, he must supply evidence sufficient to allow a jury to render a verdict in his favor." *Basith v. Cook County*, 241 F.3d 919, 926 (7th Cir. 2001). Specifically, the non-moving party "must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Filipovic v. K&R Express Systems, Inc.*, 176 F.3d 390, 390 (7th Cir. 1999). Failure by the non-movant to meet all of the above requirements subjects him to summary judgment on his claims.

Affidavits must be based on the personal knowledge of the affiant and "set out *facts* that would be admissible in evidence." Fed. R. Civ. P. 56(e) (emphasis added). Personal knowledge may include inferences and opinions drawn from those facts. *Visser v. Packer Eng. Assoc., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991). "But the inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be based on flights of fancy, speculations, hunches, intuitions or rumors remote from that experience." *Visser*, 924 F.2d at 659.

Background

Plaintiff, Daniel Escobedo, N43563, is an inmate currently incarcerated in the Illinois Department of Corrections. Plaintiff brings this cause of action alleging that the Defendants, Wexford Health Sources, Dr. Bashir Ameji and Mary Miller have violated his 8th Amendment rights by being deliberately indifferent to his serious medical needs. Specifically, Plaintiff alleges that on April 6, 2007, he suffered tremors in his left arm and leg. Plaintiff attributed this to his prescription medication, Trazadone, having run out on April 5, 2007. Plaintiff's prescription for Trazadone was renewed and he returned to his cell house. The next morning, Plaintiff returned to the Health Care Unit on the order of a Correctional Officer due to difficulty in using his left leg. Plaintiff remained in the Health Care Unit under 24 hour observation until April 9, 2007. During that period he was not seen or examined by a physician. Against the advice of medical staff, on April 9, 2007, Plaintiff asked to sign himself out of the Health Care Unit. Plaintiff was instructed to wait to be examined by Dr. Ameji before leaving the Health Care Unit. Plaintiff refused to wait and signed himself out of the Health Care Unit against medical orders prior to being examined by Dr. Ameji on April 9, 2007. Plaintiff did not seek any medical attention at the Danville Correctional Center after April 9, 2007. Plaintiff was called to the Health Care Unit and examined by Dr. Ameji on April 17, 2007. On April 17, 2007, Dr. Ameji performed a physical examination of the plaintiff and performed a mental acuity examination. Defendant Ameji, claims the Plaintiff did not exhibit any signs of having suffered a stroke. Having experienced an stroke in the past, the Plaintiff believes he suffered a stroke again in April 2007. The plaintiff did not seek any other medical treatment while he was at the Danville Correctional Center. Mary Miller reviewed and denied a grievance written by Plaintiff about the alleged inadequate medical treatment he received in April of 2007. Plaintiff alleges Mary Miller was deliberately indifferent to his serious medical needs.

Undisputed Material Facts

1. Plaintiff is an inmate who at all relevant times was incarcerated within the Illinois Department of Corrections. (Attached to Co-Defendants' MSJ, Exhibit 1, Deposition of Plaintiff Daniel Escobedo, p. 36, lines 17-21.)
2. Plaintiff suffered a stroke on September 2, 1997 while he was incarcerated at the federal prison in Pekin, IL. (Attached to Co-Defendants' MSJ, Exhibit 1, p. 20, lines 17-24).

2

3. Plaintiff experienced slurred speech when he suffered his stroke on September 2, 1997[1]. (Attached to Co-Defendants' MSJ, Exhibit 1, p. 33, lines 20-24.)
4. On April 5, 2007, Plaintiff's Trazadone prescription expired. (Attached to Co-Defendants' MSJ, Exhibit 1, p. 43, lines 2-5.)
5. Plaintiff had been taking Trazadone for two years. (Attached to Co-Defendants' MSJ, Exhibit 1, p. 42, lines 8-11.)
6. On April 6, 2007, Plaintiff was sent to the health care unit by a correctional officer who noticed his difficulty walking. (Attached to Co-Defendants. MSJ, Exhibit 1, Deposition of Daniel Escobedo, p. 38-39). Plaintiff presented to the Health Care Unit at 8:30 p.m. on April 6, 2007. The nurse's note from that date and time states as follows:

> Subjective: "I don't know. My left arm and leg have been jumping and trembling off and on all day. I think my BP is up. My Trazadone order expired a couple days ago and I think I'm starting to feel anxious again."
>
> Objective: Patient picked up from receiving unit via wheel chair per security request and transported to Health Care Unit for evaluation. Having gross tremors of left arm and leg. No facial drooping or slurring of speech noted. Vital signs: 97.5-106-18-212/90. SaO2 97%. Patient reports that he had similar episode "a couple years ago" when his BP got out of control. Above related to Dr. Ameji and orders received.
>
> Assessment: Alteration in health maintenance.
>
> Plan: Telephone orders of Dr. Ameji: 1) Restart Trazadone 15 mg by mouth for 1 month. 2) Monitor BP every 30 minutes x 2.

(Attached to Co-Defendants' MSJ, Exhibit 2, Deposition of Basher Ameji, M.D.)
7. Twenty minutes later, at 8:50 p.m. on April 6, 2007 the Registered Nurse entered the following order:

> Subjective: "I'm feeling a lot better already."
>
> Objective: Patient appears much more relaxed. No arm or leg tremors noted. Blood Pressure: 180/88.
>
> Assessment: Alteration in Health Maintenance.

---

[1]Plaintiff asserts that this fact is immaterial. However, as slurred speech is an indication of someone experiencing a stroke, the court finds that this fact is material. **Support this with Dr.'s exhibit.**

Plan: Monitor.

(Attached to Co-Defendants' MSJ, Exhibit 3.)

8. Plaintiff was again evaluated on April 6, 2007 at 9:10 p.m. the Registered Nurse's note states:

> Objective: Blood Pressure down to 142/60. Escorted back to housing unit without incident.

(Attached to Co-Defendants' MSJ, Exhibit 3.)

9. Plaintiff returned to his housing unit and slept through the night. (Attached to Co-Defendants' MSJ, Exhibit 1, p. 44, lines 7-16.)

10. The next day, April 7, 2007, a different correctional officer sent the Plaintiff to the Health Care Unit after observing his impaired motor skills. The Plaintiff was limping. (Attached to Co-Defendants' MSJ, Exhibit 1, p. 44, lines 18-24, p. 45, lines 1-9.)

11. Plaintiff arrived at the Health Care Unit at 2:15 p.m. The Registered Nurse's Notes from that date states as follows:

> Objective: Inmate picked up in Receiving in wheel chair with complaints of weakness to left lower extremity and shakiness to left hand. Inmate brought to Health Care Unit and evaluated. Blood Pressure: 190/72. Rate: 90. Pulse 18. Temperature 97.1 degrees. Heart Rate regular. Lungs clear. History of hypertension and stroke 10 years ago with left sided weakness. No complaints of headaches, visual changes, or chest pain. Inmate stated weakness started when he missed 2 doses of Trazadone and comes to Health Care Unit last night and was evaluated. Inmate states has improved since yesterday. Patient situation discussed with Physician's Assistant Mo. Sallah. Orders received. Left grasp weaker and left plantar flexion weaker than right.
>
> Plan: 23 hour hold per Mo Sallah. Give Vistaril 50 mg now. Increase Atendol to 25 mg. qd. 23 hour hold. Voice Order Mo Sallah.

This order was reviewed and signed by Dr. Ameji on April 11, 2007. (Attached to Co-Defendants' MSJ, Exhibit 3-4).

12. At 2:35 p.m. on April 7, 2007 the following was entered in Plaintiff's medical records:

> Inmate placed in Room C.

(Attached to Co-Defendants' MSJ, Exhibit 4.)

13. At 3:00 p.m. on April 7, 2007 the following was entered in the Plaintiff's medical records:

> Vistaril 50 mg. given nightly and Atendol 12.5 mg given. Patient
> states he took his morning dose of Atendol 12.5 mg. and all other
> meds.

(Attached to Co-Defendants' MSJ, Exhibits 4-5.)

14. Plaintiff remained in the Health Care Unit under 24 hour observation on April 7, 2007. (Attached to Co-Defendants' MSJ, Exhibit 1, p. 48, lines 12-14.)

15. On April 7, 2007 at 5:00 p.m., Plaintiff was observed by a Registered Nurse and the following was entered in his medical records:

> Inmate lying in bed. States Vistaril helped and leg now feels
> normal. Blood pressure: 132/60. Mo Sallah P.A. informed.

(Attached to Co-Defendants' MSJ, Exhibit 5.)

16. Plaintiff was again evaluated on April 7, 2007 at 8:35 p.m., the note states as follows:

> No change in previous.

(Attached to Co-Defendants' MSJ, Exhibit 5.)

17. On April 8, 2007 at 5:00 a.m., Plaintiff was evaluated by a Licensed Practical Nurse. The note states as follows:

> Subjective: "Alright. I'm ready to go."
>
> Objective: Temperature: 98, Pulse 71, Rate 18, Blood Pressure:
> 100/40. Rested quietly. No complaints voiced. No shortness of
> breath, respiratory or acute distress noted.
>
> Assessment: Alteration in health maintenance.
>
> Plan: Monitor.

(Attached to Co-Defendants' MSJ, Exhibit 5.)

18. On April 8, 2007, at 11:35 a.m., Plaintiff was again evaluated by a Registered Nurse:

> Subjective: "I am ready to go back to receiving."
>
> Objective: Alert and oriented x 3. Ambulates with slight unsteady
> gait and has some tremors noted to left upper extremity. No
> respiratory distress noted. Denies headaches or dizziness.
>
> Assessment: Alteration in health maintenance.
>
> Plan: Continue to monitor.

5

(Attached to Co-Defendants' MSJ, Exhibit 6.)
19. On April 8 ,2007, at 3:45 p.m., Physician's Assistant Mo Sallah performed and examination of the Plaintiff. His note from that examination states as follows:

> Subjective: Patient states that he feels fine and wants to go back to his unit.
>
> Objective: Alert and oriented x 3. Gait unsteady. Lungs: clear. Heart: S1S1, no murmur. Neuro: unsteady gait.
>
> Assessment: Status post cardio vascular accident x 10 years ago with residual left sided weakness.
>
> Plan: Will have Dr. Ameji review in the morning.

(Attached to Co-Defendants' MSJ, Exhibit 6).
20. On April 8, 2007, at 4:50 p.m., Plaintiff was again evaluated by a Registered Nurse. The note states as follows:

> Objective: Inmate sitting up in chair. Alert and oriented x 3. No problems with speech but hard of hearing. Weakness to left side. History of cardio vascular accident with recent increase in weakness. Drags left foot when walking. Tremors to left arm noted. No other deficit noted. Vital signs: BP 130/60-84-96%-18.
>
> Assessment: No change in previous assessment.
>
> Plan: Monitor.

(Attached to Co-Defendants' MSJ, Exhibit 7.)
21. On April 8, 2007, at 11:00 p.m., a nurse attempted to discharge Plaintiff from the Health Care Unit. On April 8, 2007, at 11:00 p.m. However, at that time, a physician's assistant ordered that Plaintiff be readmitted. Plaintiff was readmitted and placed under a 23 hour hold. It was determined that Plaintiff would remain in the Health Care Unit until he could examined by the doctor in the morning. (Attached to Co- Defendants' MSJ, Exhibit 8.)
22. On April 9, 2007, Plaintiff was evaluated by a Registered Nurse at midnight. The note states as follows:

> Objective: Sleeping quietly at present. Respirations normal.
>
> Assessment: Alteration in health maintenance.
>
> Plan: Monitor.

(Attached to Co-Defendants' MSJ, Exhibit 8.)
23. Plaintiff was again examined at 5:00 a.m. on April 9, 2007. The note states as follows:

> Objective: Pupils Equal and Reactive to Light. Grip decreased but equal bilaterally. Able to straight leg raise both legs to 45-90 degree angle while in bed. Speech clear. No facial ptosis noted. No tremors noted today. Slight weakness, left side noted. No complaints of pain. States "feels good."

(Attached to Co-Defendants' MSJ, Exhibit 8.)
24. Plaintiff was again seen on April 9, 2007 at 8:30 a.m. The RN note states: Subjective: "Can I go sign myself out?"

> Objective: Instructed inmate to wait for M.D.
>
> Plan: Monitor.

(Attached to Co-Defendants' MSJ, Exhibit 10.)
25. At 10:00 a.m. on April 9, 2007, the following was entered in Plaintiff's medical records:

> Objective: Inmate self requests to leave and sign myself out.

(Attached to Co-Defendants' MSJ, Exhibit 10.)
26. At 11:45 a.m. Dr. Ameji entered the following in Plaintiff's medical records: If he wants to go against medical advice, let him sign against medical advice.

(Attached to Co-Defendants' MSJ, Exhibit 9 and Exhibit 2, p. 87 lines 7-18.)
27. At 12:20 p.m. on April 9, 2007, Plaintiff was returned to the Health Care Unit and requested to sign himself out against medical orders. The note states:

> Objective: Inmate returned to Health Unit signed self out AMA. Refusal signed.
>
> Assessment: Alteration in health maintenance.

(Attached to Co-Defendants' MSJ, Exhibit 10.)
28. Plaintiff did not make any request to be seen by medical staff between April 9, 2007 and April 17, 2007. (Attached to Co-Defendants' MSJ, Exhibit 1, p. 50, lines 13-18.)
29. Mary Miller graduated from the Lakeview School of Nursing and earned a Bachelor's Degree in Science and Health Administration at St. Francis University. (Attached to Plaintiff's response as Exhibit B, p. 5, lines 9-18.) Mary Miller is a registered nurse with 30 years experience in a hospital emergency room. (Attached to Co-Defendants' SMJ as Exhibit B, Deposition of Dr. Ameji, p. 103, lines 22 - 24.)

7

30. Mary Miller was the Health Care Unit Administrator at Danville Correctional Center at all times relevant to this suit. (Attached to Defendants' SMJ as Exhibit A, Miller's Interrogatory Responses, p. 1, ¶1.)
31. Mary Miller never prevented Plaintiff from seeing a prison doctor while he was at Danville Correctional Center. (Attached to Co-Defendants' MSJ, Exhibit 1, p. 102, lines 16-19.)
32. Mary Miller reviewed a grievance written by Plaintiff about the medical treatment he received in April of 2007 and the stroke he alleges he suffered from. In response to the grievance Mary Miller stated:

> Inmate came over to health care on 4/6/07 with tremors stating he though his blood pressure was up. Vital signs were taken and he was sent back to housing. He comes back on the 7th...vital signs are taken revealing no signs of a stroke. He was given medication for his blood pressure and to help with the tremors.... On 4/9 he was seen by Dr. Amedji and the inmate wanted to sign AMA out of the infirmary. He was seen by MD on 4/17/07 and medications for B/P and other medical conditions were ordered. The only other request from him was for a copy of his medical records. Dr. Ameji will not send him out to a specialist unless it is medically necessary.

(Attached to Plaintiff's Complaint as Exhibit U.)
33. Mary Miller arrived at the determination in ¶33 by reviewing Plaintiff's chart. (Attached to Defendant's SMJ as Exhibit B, Deposition of Mary Miller, p. 25, lines 15-16.) Defendant could not recall whether she consulted with Dr. Ameji as part of her review. (Defendant Exhibit B, Deposition of Mary Miller, p. 25, lines 17-18.)
34. Both Plaintiff and Dr. Ameji deny that the Plaintiff was treated by Dr. Ameji on April 9, 2007. (Attached to Co-Defendants. MSJ, Exhibit 1, Deposition of Daniel Escobedo, p. 49-50; Attached to Co-Defendants. MSJ, Exhibit 2, Deposition of Dr. Bashir Ameji, p. 85.)
35. Doctor Ameji's practice—while Medical Director at Danville Correctional Center—was "[i]f we are suspecting somebody has a stroke, call an ambulance and send him, let the hospital determine all the other part of it." (Defendants' Exhibit 2, p. 42 and p. 52, lines 9-23.)
36. In her position as Health Care Administrator, Mary Miller spoke with Dr. Ameji every day, several times a day. Dr. Ameji kept her informed of what was going on in the medical unit as it related to medical care for the inmates. (Attached to Co-Defendants' SMJ, Exhibit B, Deposition of Dr. Ameji, p. 102, lines 14-23.)
37. Plaintiff's symptoms presented in April 2007 included left-sided weakness and a weakened left-hand grip. (Attached to Co-Defendants' Exhibits 3, 4, 6, 7, 8, 13, 14, the medical records) Dr. Ameji himself stated under oath that "[s]igns of a stroke include . . . weakness of hand or a leg on that side . . . weakness of the grip . . . ." (Attached to Co-Defendants' Exhibit 2, p. 53, lines 6-11.) Dr. Ameji also stated that not every symptom of

a stroke must be present in order for a stroke to be occurring. (Attached to Co-Defendants' Exhibit 2, p. 53, lines 19-22.)
38. Plaintiff included Mary Miller as a part of this lawsuit because 1) Plaintiff alleges Mary Miller spoke with his wife and told her everything was being taken care of in regards to his medical treatment, 2) Plaintiff tried to have conversations with her about his treatment on April 10 and 11, 2007 and Mary Miller said she did not have time to speak with Plaintiff, 3) Mary Miller did not order Dr. Ameji to send Plaintiff to an outside hospital, and 4) Mary Miller did not order Dr. Ameji to prescribe him blood clog buster medication. (Attached to Co-Defendants' MSJ, Exhibit 1, p. 106, lines 12-22.)
39. Mary Miller does not remember receiving a phone call from Plaintiff's wife. (Attached to Defendant's SMJ as Exhibit B, p. 17, lines 3-5).
40. Mary Miller cannot discuss medical issues with inmate's families unless the inmate first signs a medical release for her to do so. (Attached to Defendant's SMJ as Exhibit B, p. 12, lines 18-24 and p. 13, lines 1-5.)
41. Mary Miller does not remember the Plaintiff. (Attached to Defendant's SMJ as Exhibit B, p. 18, lines 7-10.)
42. If Mary Miller had seen the offender, it would have been documented in the medical file. (Attached to Defendant's SMJ as Exhibit B, p. 18, lines 12-18.)
43. Plaintiff's medical records contain no notation that he was seen by Mary Miller. (Attached to Co-Defendants' MSJ, Exhibits 3-14.)
44. As the Health Care Unit Administrator, Mary Miller did not provide any treatment to Plaintiff. (Attached to Co-Defendants' MSJ, Exhibit 1, p. 80, lines 3-6.)
45. The determination of whether an inmate is transported to an outside hospital, clinic or doctor for treatment is the decision of the treating physician and is based on the medical need of the patient. (Attached to Defendant's SMJ at Exhibit A. 7-8 ¶ 23.)
46. In an emergency situation, the nurses and physician's assistants and the Danville Correctional Center had the authority to send an inmate to a hospital[2]. (Attached to Co-Defendants' MSJ, Exhibit 2, p. 76.)
47. Dr. Ameji states that a physician has the ultimate authority to determine whether an inmate would be sent off-site for medical treatment. (Co-Defendant's MSJ, Exhibit 2, p. 106 ¶23-24 and 107 ¶1-2).
48. Dr. Ameji states that he does not know whether Miller provided treatment to Plaintiff and does not know whether he observed her providing treatment to Plaintiff. (Attached to Co-Defendants' SMJ as Exhibit 2, p. 123, lines 4-10.)
49. The Plaintiff's wife affies that in her observation of her husband when she visited him his left leg was dragging, his skin was a whitish-gray color and his eyes were bloodshot and he was unable to grip her with his left arm. (Attached to Plaintiff's Response, Affidavit of Linda Escobedo, pars. 10 - 11.)

---

[2]The Plaintiff disputes this fact by pointing out that Dr. Ameji's official job description requires that he review and approve all referrals to outside hospitals or specialist. This statement does not dispute the fact that in an emergency situation, the nurses and physician's assistants had the authority to send an inmate to a hospital.

Disputed Facts

50. As Health Care Unit Administrator, Mary Miller does not admit or provide health care or treatment to patients. The treatment and diagnosis of inmates is the responsibility of the treating physician. (Exhibit A, p. 6, ¶19.) However, Dr. Bashir Ameji, Medical Director at Danville Correctional Center in April of 2007, testified that Defendant Miller "had the authority to see the patient and evaluate the patient." (Attached to Co-Defendants' SMJ, Exhibit 2, Deposition of Dr. Bashir Ameji, p. 103, Lines 15-16.) Dr. Ameji also testified that Defendant did "go and examine patients." (Attached to Co-Defendants' SMJ, Exhibit 2, Deposition of Dr. Bashir Ameji, p. 105-106.)
51. Defendant states she did not have the authority to order a prisoner transported to an outside hospital, clinic or doctor for treatment. (Attached to Defendants' SMJ as Exhibit A, p. 7-8, par. 23.) However, according to Dr. Ameji, Miller "could send a patient [off-site]." According to Dr. Ameji, Miller "has done" that in the past, call an ambulance, send out a patient." (Attached to Co-Defendants' MSJ, Exhibit 2, p. 104, lines 8-12.) Dr. Ameji had "an understanding" with Miller that "if she wanted to send a patient [off-site] that looks sick," he had no problem[3]. (Attached to Co-Defendants' MSJ, Exhibit 2, p. 104, lines 1-12.) According to Dr. Ameji, Miller exercised her authority to send inmates off-site for medical treatment in emergency situations while serving as Administrator of the Health Care Unit. (Attached to Co-Defendants' SMJ, Exhibit 2, Deposition of Ameji, p. 104, lines 13-16 and 125, lines 1-6.)
52. In a phone call placed by the Plaintiff's wife, Mary Miller denied the plaintiff's wife's request that the plaintiff be sent to an outside hospital. Miller told the plaintiff's wife that such treatment was not possible[4]. (Attached to Plaintiff's Response as Exhibit 1, pg. 2 par. 21-24.) Plaintiff's wife asked that Defendant look into the situation and ultimately offered to personally pay for Plaintiff to be sent to a hospital. (Plaintiff's Exhibit 1, p. 2, ¶ 20-24.) Defendant refused. (Plaintiff's Exhibit 1, p. 2,
53. Plaintiff has suffered from limited range of motion in the left side of his body continuously since September 2, 1997. (Attached to Co-Defendants' MSJ, Exhibit 1, p. 33, lines 7-19.)
54. Although Dr. Ameji stated under oath that he did not see Plaintiff in the health care unit on April 9, 2007, Plaintiff has stated under oath and in his grievance that he did indeed see Dr. Ameji: Answer: I seen Dr. Ameji that morning sitting down, and I went and asked him if I could talk to him. He told me, no. He sent me back in the room. So when he did that, I figured he didn't want to see me, I'll go. (Attached to Co-Defendants'

---

[3]Defendant assert this fact is immaterial because there is no evidence Miller ever evaluated Plaintiff such that she could be deliberately indifferent for not sending him off-site. However, the court disagrees and finds it is material.

[4]Because Miller does not remember the phone call and because she states that she can't talk to someone about an inmate's medical concerns, this fact is listed as disputed.

10

        Exhibit 1, p. 49, lines 18-22, also attached to Plaintiff's Response, Exhibit 3, Plaintiff's grievance .)

Immaterial Fact

55.      Plaintiff has suffered three or four heart attacks prior to 2007. (Attached to Co-Defendants' MSJ, Exhibit 1, pp. 68-69.)

Discussion and Conclusion

        Prison officials violate the Eighth Amendment proscription against cruel and unusual punishment when they display "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). This encompasses a broader range of conduct than intentional denial of necessary medical treatment, but it stops short of "negligen[ce] in diagnosing or treating a medical condition." *Id.*, at 106. "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id.*

        While the state has "an affirmative obligation under the Eighth Amendment to provide persons in its custody with a medical care system that meets minimal standards of adequacy," (*Meriwether v. Faulkner*, 821 F.2d 408, 411 (7th Cir. 1987)), inmates are not entitled to unqualified access to health care. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. Detella*, 95 F.3d 586, 592 (7th Cir. 1996). Further, although a prisoner has the right to receive medical care, he does not have the right to determine the type and scope of care he personally desires. *Coppinger v. Townsend*, 398 F.2d 392, 394 (10th Cir. 1968), *citing Lawrence v. Ragen*, 323 F.2d 410, 412 (7th Cir. 1963). Further, the Eighth Amendment does not provide that an inmate is entitled to demand specific care, nor does it entitle him to the best care available. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997). However, an inmate is entitled to adequate medical treatment. *See Collingnon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998)(deliberate indifference may be established if "response so inadequate that it demonstrated an absence of professional judgment, that is, that nominally competent professional would not have so responded under the circumstances.").

        In order to state a cognizable claim against a prison official, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Estelle*, 429 U.S. at 104. Deliberate indifference requires the prison official to act with a "sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834 - (1994) *quoting Wilson v. Seiter*, 501 U.S. 294, 297 (1991). Therefore, a prison official cannot be liable under the Eighth Amendment "unless he knows that inmates face a substantial

11

risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Further, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. A prison official must reasonably respond to a prisoner's complaints, through the investigation and referral of a plaintiff's complaints, in order to be insulated from liability. *Johnson v. Doughty*, 433 F.3d 1001, 1011 (7th Cir. 2006).

However, the standard and analysis for medical professionals is "a little different" than that of other prison officials. *Chavez v. Candy*, 207F.3d 901, 905 (7th Cir. 2000). The professional judgment standard applies in Fourteenth Amendment claims to decisions made by professionals such as physicians and nurses within their area of expertise. *Id.* However, the Fourteenth Amendment professional judgment standard is comparable to the deliberate indifference standard and requires "essentially the same analysis*." Collignon v. Milwaukee County*, 163 F.3d 982, 988, 999 (7th Cir. 1998). First, a plaintiff must establish an objectively serious medical need. *Id.* "Then the plaintiff must show "(1) that the professional knew of the serious medical need, and (2) disregarded that need." An objectively serious injury or medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Chapman*, 241 F.3d at 845, *quoting Zentmyer v. Kendall County* 220 F.3d 805, 810 (7th Cir. 2000)(*quoting Gutierrez v. Peters* 111 F.3d 1364, 1373 (7th Cir. 1997)). An objectively serious condition also presents itself if "'failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain.'" *Reed v. McBride*, 178 F.3d 849, 852 (7th Cir. 1999), *quoting Gutierrez*, 111 F.3d at 1373. The trier of fact can conclude that the professional knew of the need from evidence that it was obvious and, further, it can be assumed that "what might not be obvious to a lay person might be obvious to a professional acting within her area of expertise."" *Chavez*, 207F.3d at 905 *citing Collignon*,163 F.3d at 989.

In this case, the defendant argues that plaintiff has not established an objectively serious medical need. Specifically, Defendant asserts several arguments to support her contention that an objectively serious medical condition did not exist: (1) Plaintiff was not formally diagnosed with having a stroke; (2) Plaintiff had access to medical care in April 2007; (3) Plaintiff signed out of the health care unit before being seen by a doctor; (4) Plaintiff did not present any signs of a stroke when he was finally examined by Dr. Ameji.

The Plaintiff correctly points out that case law does not support the contention that a deliberate indifference claim should lose on summary judgment for lack of a physician's diagnosis. In lieu of a formal diagnosis, an objectively serious medical condition may be found when the ailment "is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Johnson*, 444 F.3d at 584. In this case, Plaintiff was twice sent to the health care unit by "lay persons" who realized the plaintiff required medical care. On April 6, 2007, Plaintiff was originally sent to the health care unit by a guard who noticed his difficulty walking. After being sent back to his cell, a different officer sent Plaintiff back to health care unit for treatment after observing his impaired motor skills. While the opinion of two "lay persons" should be sufficient to establish a genuine issue of material fact, the facts of this case lend even

stronger support. When Plaintiff was sent to the health care unit on April 6, 2007, the nurse, a trained medical professional, who first saw Plaintiff called Dr. Ameji—an action that Dr. Ameji himself stated would only occur if the nurse thought that a patient needed to be seen by a physician. (Attached to Co-Defendants. MSJ, Exhibit 2, Deposition of Dr. Bashir Ameji, p. 76, lines 1-3, 4-9.) The medical records indicate that the plaintiff was placed on a 24 hour observation in the infirmary on April 7. Two days later, on April 8, 2007, a nurse "okay"d" Plaintiff to be discharged, but Plaintiff was readmitted by a physician"s assistant who determined that the Plaintiff should remain in the infirmary so he could see a physician in the morning. Plaintiff remained in the infirmary from 2:15 p.m., April 7 until 12:20 p.m., April 9, where he was treated and evaluated by several nurses and a physician assistant. When Plaintiff checked himself out, medical staff instructed him to stay until he could be examined by a doctor. Further, the Plaintiff's wife affies that in her observation of her husband when she visited him his left leg was dragging, his skin was a whitish-gray color and his eyes were bloodshot and he was unable grip her with his left arm. Thus, in a three-day period from April 6 to April 8, 2007, three "lay persons" and several medical professionals felt that Plaintiff's condition was so obvious as to warrant a doctor's attention. Based upon these facts, the court cannot find that the Plaintiff did not have a serious medical need. A jury could reasonably conclude based upon these facts that the Plaintiff has an objectively serious medical need.

It is ironic, considering the nature of the allegations in this case, that Defendant would cite Plaintiff's lack of a formal diagnosis as a reason for granting summary judgment. In fact, part of Plaintiff's claim is that he was unable to receive tests such as an MRI or CT scan, for the purposes of formally diagnosing his condition and receiving appropriate treatment, because Defendant and co-defendants refused to allow Plaintiff to be taken to a hospital. In addressing a motion for summary judgment premised, in part, on a defendant's lack of an objective diagnosis, the Seventh Circuit found a similar set of circumstances to be remarkable: "[T]he defendants fail to acknowledge that [plaintiff] spent two years trying to obtain objective. evidence, but was prevented from doing so by [defendant doctor and other medical professionals.]" *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005). The very fact that Plaintiff has been unable to receive the testing needed to obtain objective evidence of his condition is an issue worthy of jury contemplation, as it shows that Plaintiff was never sent to a hospital to receive the treatment he needed—part of the premise of this lawsuit.

Defendant argues that even if Plaintiff were able to establish that he had an objectively serious medical need, there is no evidence that this defendant, Mary Miller disregarded that need. Defendant asserts that she appropriately responded to Plaintiff's grievance and ensured that Plaintiff had access to medical care. However, the Seventh Circuit has specifically stated that the fact that a plaintiff received some treatment does not preclude success on a deliberate indifference claim, as a plaintiff "is not required to show that he was literally ignored by the staff . . . a jury could find deliberate indifference although the prisoner was not simply ignored." *Sherrod v. Lingle*, 223 F.3d 605 (7th Cir. 2000). Further, the possibility that a doctor and nurse "did not do more" for a plaintiff because they believed he "did not really have a severe medical need is an issue for the jury." *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (*emphasis added*). In this case, Plaintiff does not dispute that he was taken to the health care unit on April

6, 2007. However, he believes that the treatment that he received was obviously inadequate so as to amount to deliberate indifference. The court acknowledges that the Plaintiff checked himself out of the infirmary, three days after he first presented himself and after waiting two days to see a physician. However, the plaintiff says he checked himself out without seeing the doctor because when he asked Dr. Ameji could he talk to him, Ameji responded no. Plaintiff believed Dr. Ameji did not want to see him, so he left the infirmary. Despite presenting at least some symptoms of a stroke, Plaintiff was not treated by a doctor until eleven days after he was first sent to the health care unit. When Plaintiff was first brought in, the only physician on call was not present. The nurse telephoned that physician, Dr. Ameji, an action that would only be undertaken if the nurse felt that the inmate needed to be seen by a physician. Rather than adhere to his standard procedure and have an inmate in need of a physician's treatment be sent to a hospital, Dr. Ameji had him confined in the health care unit for days without seeing a doctor. When the Defendant reviewed the Plaintiff's grievance, she knew this. After observing his difficulty walking and weak grip with his left arm, Plaintiff's wife returned home and she says she called Defendant. Maybe she did, maybe she did not. That would be an issue for the jury to determine. A jury could believe that Plaintiff's wife asked that Defendant look into the situation and ultimately offered to personally pay for Plaintiff to be sent to a hospital and that Defendant refused. (Plaintiff.s Exhibit 1, p. 2, ¶ 24.) A jury could find that Plaintiff tried to have conversations with her about his treatment on April 10 and 11, 2007 and Miller told him that she did not have time to speak with Plaintiff. Whether, after being made aware of Plaintiff's medical condition, with the facts before this court, Defendant's refusal to have Plaintiff sent to an outside physician rises to the level of deliberate indifference is a genuine issue of material fact to be decided by a jury.

Further, "a jury could find deliberate indifference from [a doctor's] refusal over a two year period to refer [the plaintiff] to a specialist" or authorize a diagnostic test, even though the plaintiff saw the prison doctor. *Greeno*, 414 F.3d at 655. Defendant reviewed the situation when Plaintiff's grievance regarding his condition came across her desk. As part of the grievance procedure, Defendant reached a determination of the grievance by "review of the chart." Defendant could not recall whether she consulted with Dr. Ameji as part of her review. In her grievance report, Defendant—despite repeated references in Plaintiff's medical records from April 2007—failed to cite the fact that Plaintiff had experienced damage to the left side of his body and was having trouble walking. This Defendant is a nurse with 30 years of hospital emergency room experience – one that a jury could find would recognize the signs and symptoms of a stroke. Further, Defendant's report falsely claimed that Plaintiff was seen by a physician, Dr. Ameji, on April 9, 2007. Both Plaintiff and Dr. Ameji deny that any such examination occurred. Is she allowed to use such selective reporting of symptoms and a false statement regarding treatment by a physician to reject Plaintiff's request for a "full medical examination by an outside facility?" As she had daily conversations with Dr. Ameji about the medical care being provided to inmates in the clinic, Miller would know that in his absence, Dr. Ameji's practice was to send to the hospital those who were suffering a stroke. Health Care Unit Administrator, Miller claims she does not admit or provide health care or treatment to patients, but according to Dr. Ameji, Miller in performing her duty as a health care unit administrator Miller, did go and examine patients. These are issues of credibility. If a jury believes Ameji,

14

rather than Miller, this is a factor that a jury could use to determine the issue of deliberate indifference by the Defendant, Miller. Perhaps the jury might believe that Miller deliberately chose to not examine the Plaintiff because she was indifferent to fact that perhaps he had or was actually suffering a stroke. Perhaps the jury might conclude the Miller was able to unilaterally send Plaintiff to an outside hospital for medical care. Considering the facts before this court, a jury might reasonably conclude that Defendant was deliberately indifferent to Plaintiff's serious medical need by refusing to allow him to see an outside doctor.

      As there are genuine issues of material facts which must be decided by a trier of facts, this court must and does deny Defendant's summary judgment motion.

Based on the foregoing:

1. Defendant, Mary Miller's summary judgment motion [100] is denied. Plaintiff may proceed against Miller on his claim for deliberate indifference to serious medical need.

Enter this  3rd  day of March 2010.


                /s/ Michael P. McCuskey
                _____
                Michael P. McCuskey
                Chief United States District Judge